# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 7, 2018          Decided August 2, 2019

No. 17-1098

ALLEGHENY DEFENSE PROJECT, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ANADARKO ENERGY SERVICES COMPANY, ET AL.,
INTERVENORS

Consolidated with 17-1128, 17-1263, 18-1030

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

*Elizabeth F. Benson* argued the cause for petitioners Allegheny Defense Project, *et al*. *Siobhan K. Cole* argued the cause for petitioners Hilltop Hollow Limited Partnership, *et al*. With them on the joint briefs was *Benjamin A. Luckett. Michael N. Onufrak* and *Derek O. Teaney* entered appearances.

*Beth G. Pacella*, Deputy Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *James P. Danly*, General Counsel,

2

and *Robert H. Solomon*, Solicitor. *Anand Viswanathan*, Attorney, entered an appearance.

*John F. Stoviak* argued the cause for intervenors. With him on the joint brief were *Pamela S. Goodwin*, *Elizabeth U. Witmer*, *Patrick F. Nugent*, *Kevin M. Sweeney*, *Jesse Stuart Unkenholz*, and *Scott Borden Grover*.

Before: GARLAND, *Chief Judge*, and TATEL and MILLETT, *Circuit Judges*.

Opinion for the court filed PER CURIAM.

Concurring opinion filed by *Circuit Judge* MILLETT.

PER CURIAM: In February 2017, the Federal Energy Regulatory Commission approved a natural gas pipeline expansion called the Atlantic Sunrise Project, which stretches from northern Pennsylvania, across the Carolinas, and into Alabama. Environmental Associations whose members live and work in the areas affected by the Project and individual Homeowners whose property was used for the Project seek review of the Commission's orders permitting the Transcontinental Gas Pipe Line Company to move forward with the pipeline expansion. Because the challenges to the Commission's decision cannot surmount the deferential standards of agency review and binding circuit precedent, we deny the petitions.

**I**

**A**

Under the Natural Gas Act, 15 U.S.C. § 717 *et seq.*, a company wishing to construct a natural gas pipeline must first

obtain a certificate of "public convenience and necessity" from the Federal Energy Regulatory Commission. *See id*. § 717f(c); *Myersville Citizens for a Rural Community, Inc. v. FERC*, 783 F.3d 1301, 1307 (D.C. Cir. 2015). The Commission "shall * * * issue[]" the certificate if it finds that the proposed project "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e).

When a pipeline company files a certificate application, the Commission reviews it under criteria set forth in its Certificate Policy Statement, 88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000). The Certificate Policy Statement directs the Commission to consider whether the project meets a market need and whether the public benefits of the project outweigh the harms. *See Sierra Club v. FERC*, 867 F.3d 1357, 1379 (D.C. Cir. 2017). If market need and public benefit are both established, the Commission will issue a certificate authorizing the pipeline's construction. *Id*. Once that certificate is granted, the Natural Gas Act empowers the private certificate holder to exercise eminent domain authority if it "cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipeline[.]" 15 U.S.C. § 717f(h).

A party wishing to challenge the Commission's issuance of a certificate of public convenience and necessity must file a petition for rehearing with the Commission. 15 U.S.C. § 717r(a). Until the Commission disposes of that rehearing petition, the agency action is not final for purposes of judicial review. *See id.* § 717r(a)–(b); *Clifton Power Corp. v. FERC*, 294 F.3d 108, 110–111 (D.C. Cir. 2002). The filing and disposition of such a rehearing petition is thus a mandatory

prerequisite to obtaining judicial review of the Commission's action. *See Delaware Riverkeeper Network v. FERC*, 857 F.3d 388, 399 (D.C. Cir. 2017); *Clifton Power Corp.*, 294 F.3d at 110–111. Congress directed that petitions for rehearing may be "deemed to have been denied" if the Commission has not "act[ed] upon the application for rehearing within thirty days after it is filed[.]" 15 U.S.C. § 717r(a).

The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, "require[s] the Commission to consider and disclose the environmental effects of the actions it certifies." *Delaware Riverkeeper Network*, 857 F.3d at 394 (internal quotation marks omitted). The Commission may fulfill this requirement by compiling an Environmental Impact Statement, which must consider, among other things, the proposed project's "indirect" environmental effects. *See* 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1508.8, 1508.25(c).

**B**

In March 2015, the Transcontinental Gas Pipe Line Company ("Transco") applied for a certificate of public convenience and necessity to build the Atlantic Sunrise Project. After notice and public comment, the Commission issued a final Environmental Impact Statement in December 2016. In that Statement, the Commission concluded that "neither construction nor operation of the Project would significantly contribute to [greenhouse-gas] cumulative effects or climate change." J.A. 323.

On February 3, 2017, the Commission granted Transco its requested certificate of public convenience and necessity. 158 FERC ¶ 61,125 (2017) ("Certificate Order"). Environmental Associations and the private Homeowners whose land would become subject to an easement for the Project both filed

petitions for rehearing with the Commission, along with motions for a stay of construction pending disposition of their petitions. Before Congress's 30-day deadline for action on the rehearing petitions expired, the Commission "granted" rehearing, but only "for the limited purpose of further consideration." J.A. 600 ("Certificate Tolling Order"). The Commission took no action on the stay motions for more than five months, and then denied them.

In late August, a Pennsylvania federal district court presiding over Transco's eminent domain action entered an order that declared Transco's "right to immediate possession of the properties in question," based on the presumed validity of FERC's Certificate Order. *Transcontinental Gas Pipe Line Co. v. Permanent Easements for 2.14 Acres & Temp. Easements for 3.59 Acres in Conestoga Township, Lancaster County, Pa., Tax Parcel No. 1201606900000*, 2017 WL 3624250, at *1, *3 (E.D. Pa. Aug. 23, 2017) (rejecting the Homeowners' objections as "attacks on the FERC order itself," which "can only be challenged in front of FERC, and then in the United States Court of Appeals for the District of Columbia Circuit"), *aff'd*, 907 F.3d 725 (3d Cir. 2018).

On September 15, 2017, while the Environmental Associations' and Homeowners' petitions for rehearing were still pending, the Commission issued an order authorizing Transco to begin construction of the Project. J.A. 616 ("Construction Order"). Transco broke ground that same day.

The Environmental Associations promptly moved for rehearing of the Construction Order and an order halting construction. As its 30-day statutory deadline for action on the Construction Order rehearing petition approached, the Commission again issued an order granting rehearing "for the

limited purpose of further consideration." J.A. 815 ("Construction Tolling Order").

The Commission eventually denied the Homeowners' and Environmental Associations' petitions for rehearing in December 2017, more than nine months after rehearing was sought and three months after construction began. 161 FERC ¶ 61,250 (2017) ("Certificate Rehearing Order"). Three months after that—and nearly six months after construction commenced—the Commission denied rehearing of the Construction Order. 162 FERC ¶ 61,192 (2018) ("Construction Rehearing Order").

## II

This consolidated case arises out of four petitions for review collectively challenging the Certificate Order, the Certificate Tolling Order, the Construction Order, the Construction Tolling Order, and the Certificate Rehearing Order. Because the Homeowners and Environmental Associations both properly sought rehearing of the Certificate Rehearing Order, which encompasses all of their claims for our review and is the final agency decision greenlighting the Project, this court has jurisdiction. *See* 15 U.S.C. § 717r.[1]

The Commission's factual findings are conclusive so long as they are supported by substantial evidence. *See* 15 U.S.C. § 717(b). Where the Commission "has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made," we must uphold its decision. *FERC v.*

---

[1] We therefore deny as moot the motions to dismiss the petitions filed before the Certificate Rehearing Order issued, Nos. 17-1098 and 17-1128.

*Electric Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016) (formatting altered).

The Homeowners and Environmental Associations argue that the Commission's Certificate Order suffers from fatal substantive and procedural flaws. Specifically, they argue that the Commission improperly conducted its environmental assessment under NEPA, failed to substantiate market need for the Project as required by the Natural Gas Act, and denied them due process by authorizing construction to commence before the issuance of the Certificate Order could be judicially reviewed. None of those arguments succeed.

**A**

The administrative record forecloses the Homeowners' and Environmental Associations' three NEPA arguments.

*First*, the Homeowners and Environmental Associations argue that the Commission did not factor downstream greenhouse-gas emissions into its evaluation of the Project's environmental impacts.

The Homeowners and Environmental Associations are correct that customers' burning of the natural gas that the Project transports will produce greenhouse-gas emissions. *See Sierra Club*, 867 F.3d at 1374. They are also correct that NEPA required the Commission to consider both the direct and indirect environmental effects of the Project, and that, despite what the Commission argues, the downstream greenhouse-gas emissions are just such an indirect effect. *See id.*; 40 C.F.R. § 1502.16(b).

But that is as far as the argument gets them, because the Commission already took the steps the Homeowners and

Environmental Associations request. The Commission addressed downstream emissions in the Environmental Impact Statement, the Certificate Order, and the Certificate Rehearing Order. In particular, the Commission estimated the amount of $CO_2$ emissions resulting from the gas that the Project would transport and predicted that those emissions would be partially offset by reductions in higher carbon-emitting fuel that the Project's natural gas would replace. Neither the Homeowners nor the Environmental Associations have identified what more the Commission should have said. That failure is fatal. Unsubstantiated objections are not enough to stop an agency's action.

*Second*, the Homeowners and Environmental Associations assert that the Commission impermissibly segmented its environmental review by failing to consider the synergistic effect of the Project on emissions associated with a different pipeline—the Southeast Market Pipeline. Improper segmentation occurs when FERC creates separate Environmental Impact Statements for interconnected pipelines that should have been evaluated as a single project. *See City of Boston Delegation v. FERC*, 897 F.3d 241, 251–252 (D.C. Cir. 2018).

But NEPA requires more to make out an improper segmentation claim than the Homeowners and Environmental Associations have offered. Specifically, the Commission has no duty to consider the environmental effects of a separate project if the project in question has "substantial independent utility." *City of Boston Delegation*, 897 F.3d at 252 (internal quotation marks omitted); *see also Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987) (asking "whether one project will serve a significant purpose even if a second related project is not built").

The record supports the Commission's determination that the Southeast Market Pipeline and the Project are independently justified and that each has its own distinct utility. *City of Boston Delegation*, 897 F.3d at 252. That is because, even if the Project were never built, the Southeast Market Pipeline still would be connected to enough natural gas supply to exceed its capacity. J.A. 843. On this record, that disproves any claim of improper segmentation.

*Third*, the Homeowners and Environmental Associations contend that the Commission was deficient in its analysis of an alternative site for the Project called the Conestoga Route. Under NEPA, agencies must "identify the reasonable alternatives to the contemplated action," *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 102 (D.C. Cir. 2014), and "discuss[] * * * the relevant issues and opposing viewpoints," *Myersville*, 783 F.3d at 1324–1325 (quoting *Nevada v. Department of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)). This requirement helps ensure that agency actions are "fully informed and well-considered." *Id.* at 1325 (internal quotation marks omitted).

The Commission's consideration of the Conestoga Route passes NEPA muster. The Commission "look[ed] hard at the environmental effects of its decision" by comparing the proposed route with the Conestoga Route across highly detailed criteria. *Minisink*, 762 F.3d at 102 (formatting altered).[2] In doing so, the Commission openly grappled with the factors favoring the Conestoga Route and reasonably explained why the proposed route was nonetheless superior.

---

[2] The "Waterbodies crossed" criterion, for example, quantifies waterbodies for "Trout Stocking," "High Quality Cold Water Fishes," "Cold Water Fishes," "High Quality Warm Water Fishes," and "Warm Water Fishes." J.A. 318.

It acknowledged that the Conestoga Route was shorter and would follow existing rights-of-way for more of its length than the proposed route would, but it placed more weight on the proposed route's virtues, including that it would cross fewer recreational areas and would avoid potentially dangerous elevation changes. That suffices for NEPA. *See Myersville*, 783 F.3d at 1308; *Minisink*, 762 F.3d at 112.

## B

The Homeowners and Environmental Associations separately claim that the Commission's market-need determination violated the Natural Gas Act. A showing of market need is a precondition for the Commission to issue a certificate of public convenience and necessity. *See Sierra Club*, 867 F.3d at 1379; *Myersville*, 783 F.3d at 1309; 90 FERC at ¶ 61,392; 88 FERC at ¶ 61,746. The certificate applicant can make its required showing of market need for the pipeline "by presenting evidence of 'preconstruction contracts' for gas transportation service." *Sierra Club*, 867 F.3d at 1379.

The Commission held Transco to this obligation. Its finding of market need rested on the existence of contracts with shippers for 100% of the Project's capacity. That alone is enough. *See Sierra Club*, 867 F.3d at 1379; *Myersville*, 783 F.3d at 1311; *Minisink*, 762 F.3d at 111 n.10. And the Commission did not stop there. It also relied on comments by two shippers and one end-user, as well as a study submitted by one of the Environmental Associations, all of which reinforced the demand for the natural gas shipments.

11

**C**

Finally, the Environmental Associations and Homeowners argue that the Commission's authorization for construction to go forward while their rehearing petitions were still pending—and thus before the Commission's decision was final and judicially reviewable—denied them due process. Circuit precedent forecloses their claims.

A due-process claim turns on two essential inquiries. First, is there a "liberty or property interest of which a person has been deprived"? *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). Second, were the "procedures followed" by the government in encroaching on those interests "constitutionally sufficient"? *Id*.

The Environmental Associations run into trouble on the first prong of that test. They assert that liberty and property interests were bestowed upon them by the Pennsylvania Constitution's Environmental Rights Amendment, Pa. Const. Art. 1, § 27, and the Natural Gas Act's review procedures, 15 U.S.C. §§ 717f(c)(1)(B), 717r(a)–(b). This court has already rejected those claims, and those decisions control here. *See Delaware Riverkeeper Network v. FERC*, 895 F.3d 102, 110 (D.C. Cir. 2018) (Pennsylvania Constitution); *Griffith v. Federal Labor Relations Auth.*, 842 F.2d 487, 495 (D.C. Cir. 1988) (Natural Gas Act review procedures); *see generally LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) ("One three-judge panel * * * does not have the authority to overrule another three-judge panel of the court.").

The Homeowners, for their part, lose on the second prong of the due-process analysis. They argue that the Commission's delay in acting on their rehearing petitions while authorizing construction to start "denied [them] the right to be

heard on whether Transco's taking of their property actually satisfies the public use requirement of the Fifth Amendment." Petitioners' Opening Br. 47.

But, again, circuit precedent says otherwise. We have held that, as long as FERC's public-convenience-and-necessity determination is not legally deficient, it necessarily satisfies the Fifth Amendment's public-use requirement. *See Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960, 973 (D.C. Cir. 2000). The Homeowners make no claim that they were deprived of a meaningful opportunity to be heard as part of the Commission's proceedings leading up to its issuance of the Certificate Order, and they make no effort to distinguish (or even acknowledge) our holding in *Midcoast*.

\* \* \*

For the foregoing reasons, the petitions for review are denied.

*So ordered.*

MILLETT, *Circuit Judge*, concurring: As for the Homeowners' due-process claim, I recognize that circuit precedent ties my hands. But the Commission has twisted our precedent into a Kafkaesque regime. Under it, the Commission can keep homeowners in seemingly endless administrative limbo while energy companies plow ahead seizing land and constructing the very pipeline that the procedurally handcuffed homeowners seek to stop. The Commission does so by casting aside the time limit on rehearing that Congress ordered—treating its decision as final-enough for the pipeline companies to go forward with their construction plans, but not final for the injured landowners to obtain judicial review. This case starkly illustrates why that is not right.

**I**

My concern is not one of outcomes. The law and administrative record dictate who should win in this case, as in all Commission cases. My concern is about fair process and, in particular, the ability of those who are directly injured—the individuals whose property is taken in whole or in part by Commission order—to have their day in court before it is too late.

The Homeowners in this case are the Erb and Hoffman families. Their "much beloved properties," J.A. 581, are located in Southeastern Pennsylvania, *see* Transcript of Evidentiary Hearing 9, 53, ECF No. 27 (E.D. Pa. July 20, 2017) ("Hearing Tr."). That was where the Erbs built their "dream home" and planned for their three sons to settle one day. *Id.* at 10–11. The Hoffmans' house is tucked among "rolling hills" on their property—a home designed to be so private that it could not be seen from the road. *Id.* at 52–53. They built their lives there, among "lots of wildlife," including the scores of deer and turkeys they fed each day. *Id.* at 54. Both

families cherished the quiet, secluded nature of the places where they chose to live.

That was until the Commission allowed the Transcontinental Gas Pipeline Company ("Transco") to move in. In October 2015, the Commission notified the Erbs and the Hoffmans that a pipeline under consideration might cut right through their land. That would mean "removing topsoil, trees, shrubs, brush, roots, and large rocks, and then removing or blasting additional soil and bedrock to create a trench for the pipeline," and giving Transco a permanent right-of-way through their yards. J.A. 581. The Erbs were "deathly afraid of the pipeline" and did not "want to be anywhere near it." Hearing Tr. 45. The Hoffmans found the idea "unacceptable" and "disturbing," because Transco's right-of-way in the middle of their property would "totally take[] [their] privacy away." *Id*. at 59.

The Erbs and the Hoffmans fought hard before the Commission to preserve their land. After the Certificate Order issued, the Homeowners filed their request for rehearing as well as a motion to stay the Certificate Order pending the agency's final rehearing decision. During the 30-day time period allotted by Congress for agency action on the Homeowners' rehearing requests, the Commission ignored the application for a stay. And before the 30th day passed, the Commission issued a so-called "tolling order." J.A. 600 ("Certificate Tolling Order"). Offering no explanation whatsoever for its delay, the Commission just declared that rehearing was "granted" for the sole purpose of buying the Commission more time. *Id*. ("[R]ehearing of the Commission's order is hereby granted for the limited purpose of further consideration[.]").

The upshot of the Commission's self-help was that its continued inaction on rehearing—the non-finality of the Certificate Order—jurisdictionally locked the Homeowners out of federal court. *See Delaware Riverkeeper Network v. FERC*, 857 F.3d 388, 393 (D.C. Cir. 2017); *Clifton Power Corp. v. FERC*, 294 F.3d 108, 110–111 (D.C. Cir. 2002). Indeed, when the Homeowners petitioned this court for review of both the Certificate Order and the Certificate Tolling Order, both the Commission and Transco were quick to seek dismissal of the petitions as "incurably premature" because the rehearing requests had not yet been resolved. *See* Motion of Movant-Intervenor Transcontinental Gas Pipe Line Company, LLC to Dismiss the Petitions for Review 15, No. 17-1128 (June 30, 2017); *see also* Motion of Federal Energy Regulatory Commission to Apply Disposition of the Motion to Dismiss Filed in Docket No. 17-1098 to the Instant Petitions, No. 17-1128 (June 30, 2017); Motion to Dismiss for Lack of Jurisdiction 5–6, No. 17-1098 (April 28, 2017).

While non-final for the Erbs and Hoffmans, the Commission's order was still final enough for Transco to prevail in an eminent domain action in a Pennsylvania federal district court and to acquire the needed easements over the Erbs' and Hoffmans' land. Transco told the district court that, in deciding whether eminent domain is appropriate, it "must consider that the [Certificate Order] is *final*" and that its finding of public convenience and necessity controlled the question of whether the land was being taken for a public use. Hearing Tr. 138–139 (emphasis added). On that basis, the district court granted Transco the "right to immediate possession of the properties[.]" *Transcontinental Gas Pipe Line Co. v. Permanent Easements for 2.14 Acres & Temp. Easements for 3.59 Acres in Conestoga Township, Lancaster County, Pa., Tax Parcel No. 1201606900000*, 2017 WL 3624250, at *1 (E.D. Pa. Aug. 23, 2017), *aff'd*, 907 F.3d 725 (3d Cir. 2018); *see also id.*

at *3–4 (rejecting the Homeowners' claims as "attacks on the FERC order itself," which the district court did not have jurisdiction to consider).

On August 31, 2017—eight days after Transco prevailed in its eminent domain action and more than six months after the Homeowners asked the Commission for a stay of the Certificate Order—the Commission denied the Homeowners' request for a stay. The Commission reasoned that the Homeowners' objections to Transco bulldozing and blasting its pipeline into their homesteads were nothing more than "generalized claims of environmental harm [that] do not constitute sufficient evidence of irreparable harm that would justify a stay." 160 FERC ¶ 61,042, 2017 WL 3835932, at *2 (Feb. 9, 2017).

Two weeks later, apparently still too busy to act on the Homeowners' rehearing petition, the Commission nonetheless found the time to issue a Construction Order authorizing Transco to start construction on the Homeowners' land. J.A. 616 ("Construction Order"). Which Transco promptly did. J.A. 616; Oral Arg. Tr. 19. And when the 30-day time limit for action on a request for rehearing of the Construction Order approached, guess what? The Commission once again issued an order that did nothing but give the Commission more time to decide. *See* J.A. 815. Meanwhile, Transco's construction continued apace. And the Homeowners remained trapped before the agency.

The Commission did not issue a final, appealable certificate decision until December 6, 2017, months *after* Transco had started construction.

5

**II**

Circuit precedent gave the Commission the tools it has used to create this administrative quagmire for those who seek to challenge its decisions. In my view, we should put an end to it. A scheme that walls homeowners off from timely judicial review of the Commission's public-use determination, while allowing eminent domain and functionally irreversible construction to go forward, is in substantial tension with statutory text and runs roughshod over basic principles of fair process.

**A**

**1**

This much is clear: The Natural Gas Act makes the filing of a rehearing petition a jurisdictional precondition to obtaining judicial review of Commission decisions. 15 U.S.C. § 717r(a)–(b). The Act spells out what the Commission can do once an application for rehearing is filed. It "shall have power to grant or deny rehearing or to abrogate or modify its order[.]" *Id*. § 717r(a). Unless the Commission so "acts upon the application for rehearing within thirty days," rehearing "may be deemed to have been denied." *Id*.

The most natural reading of that language is that Congress told the Commission to "act[] upon the application for rehearing" and to do so "within thirty days." 15 U.S.C. § 717r(a).

The Commission reasons that it has "acted" because it gave itself more time. But the Natural Gas Act requires the Commission not just to act, but to "act[] upon the application" itself. 15 U.S.C. § 717r(a). And Congress specified which

Commission actions count as "acts upon the application": The Commission could "grant" rehearing, "deny" it, "modify" the underlying order, or "abrogate" it. *Id*. Casting aside Congress's time limit is not on that menu.

The Natural Gas Act answers the question of what should happen if the Commission finds itself unable to act within the allotted 30 days. Rehearing "may be deemed denied" by the aggrieved party, who may then obtain judicial review. 15 U.S.C. § 717r(a); *see id*. § 717r(b); *cf.* 28 U.S.C. § 2675(a) (Under the Federal Tort Claims Act, "[t]he failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section."); 42 U.S.C. § 2000e-16(c) (Under Title VII of the Civil Rights Act of 1964, agency inaction after a specified time period for agency decision permits the complainant to proceed to court.). There is no point to that statutory time limit if the Commission can ignore it for no reason at all and with no consequence at all.

Congress, in other words, gave the Commission 30 days to fish or cut bait. Trapping an aggrieved party in administrative limbo while the Commission spends several months thinking about whether to go fishing is not an option.

**2**

But circuit precedent says otherwise. We have held that the Commission's tolling orders qualify under the statute as an action upon the rehearing request. *See Delaware Riverkeeper Network v. FERC*, 895 F.3d 102, 113 (D.C. Cir. 2018); *see also Moreau v. FERC*, 982 F.2d 556, 564 (D.C. Cir. 1993) (FERC had "yet to rule on the merits" after forty-four days).

*Delaware Riverkeeper* and *Moreau* faithfully followed the fountainhead of circuit precedent upholding the Commission's tolling orders: *California Company v. Federal Power Commission*, 411 F.2d 720 (D.C. Cir. 1969) (per curiam). But that decision long predates modern statutory construction jurisprudence, and did not claim to turn on the best reading of the statutory text. To the contrary, *California Company* described the Commission's reading of Section 717r(a) as "far from self-evident." *Id*. at 722. Nonetheless, the court deferred to the Commission because its approach "avoids * * * administrative and judicial problems." *Id*.

The court in *Delaware Riverkeeper* found itself bound by *California Company*, and thus yielded to concerns about the workability of a scheme that ties the Commission's often complicated decisionmaking to a tight 30-day timeframe. *See* 895 F.3d at 113. But, alas, "[i]f you give a mouse a cookie * * *."[1] The Commission has taken this court's patience and turned it into a license to routinely blow past Congress's deadline, granting itself as much time as it desires to act on rehearing requests. One recent study showed that, between 2009 and 2017, the Commission issued tolling orders in response to 99% of requests for rehearing of pipeline certification decisions. Petition for an Extraordinary Writ, *In re Appalachian Voices, et al.*, No. 18-1006 at Exhibit G (Jan. 8, 2018) ("Exhibit G") (cataloguing tolling orders issued in 74 out of 75 pipeline certifications between 2009 and 2017); *see also Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624, 631 n.4 (4th Cir. 2018) (noting that FERC does not dispute that it "regularly" issues tolling orders). FERC has issued a boilerplate tolling order in response to every motion for rehearing of a pipeline certification decision since 2017 too.

---

[1] *See* LAURA NUMEROFF, IF YOU GIVE A MOUSE A COOKIE (1985).

It also bears noting that this court's acceptance of tolling orders started in a case that involved disputes over money, not property. *See California Co.*, 411 F.2d at 720 (rate dispute). The same is true of all of the other cases cited in *Delaware Riverkeeper*. *See* 895 F.3d at 113 (citing *Kokajko v. FERC*, 837 F.2d 524, 526 (1st Cir. 1988) (fees); *General American Oil Co. of Tex. v. Federal Power Comm'n*, 409 F.2d 597, 599 (5th Cir. 1969) (rates)). Because disputes over monetary payments can be fixed later, the consequences of Commission delay were temporary and remediable. One side or the other would have to bear the financial cost while administrative and judicial litigation went forward. The tolling order just assigned that burden to the party that lost before the agency.

But allowing the Commission to take its time while private property is being destroyed is another thing altogether. Under the Natural Gas Act, "any holder of a certificate * * * may acquire the [property] by the exercise of the right of eminent domain." 15 U.S.C. § 717f(h). On top of that, courts involved in eminent domain proceedings—including in this case—routinely treat the Commission's non-final certificate order as final and conclusive evidence that the taking serves a public purpose. *See Transcontinental Gas Pipe Line Co.*, 2017 WL 3624250, at *4 (collecting cases).

Congress further directed that the filing of an application for rehearing "shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's [certificate] order." 15 U.S.C. § 717r(c). Of course, in doing so, Congress presumably expected that rehearing decisions would be resolved within 30 days, as the statute says. *See id.* § 717r(a). In other words, as Congress designed the rehearing system, eminent domain proceedings would likely not conclude before the Commission acted on rehearing and

afforded the applicant an opportunity for judicial review of the public-use determination.

The Commission's use of tolling orders upends that balanced framework. Now the Commission can, in effect, split the atom of finality knowing that its certificate orders will be treated as conclusive in eminent domain proceedings, while shielding those same orders from judicial scrutiny as non-final. This imbalance is what allowed Transco's lawyer in this case to tell the Pennsylvania district court that, "as to this process, the eminent domain process, the [certificate] order is final," Hearing Tr. 80, while it and the Commission told this court that the very same certificate order does not constitute final agency action for purposes of the Homeowners' effort to obtain judicial review, *see* Motion of Movant-Intervenor at 15 (arguing that the Homeowners' petition for review of the Certificate Order must be dismissed as "'incurably premature' because a Tolling Order was timely issued and the Commission has not yet ruled on the merits of the Requests for Rehearing"); *see also* Commission's Br. 8 (asserting the same argument).

Making that bad situation worse, the Commission that says it is too busy to act on rehearing applications nevertheless consistently manages to find the time to grant orders authorizing construction to go forward while rehearing is still pending. *See* Construction Order; Exhibit G (cataloguing cases where FERC authorized construction during the tolling period).

The result is that the Commission can toll until the cows come home and thereby forestall judicial review while people's homesteads are being destroyed. And the Commission knows exactly what it is doing with its repeated issuance of cookie-cutter tolling orders. Commissioner Glick has openly acknowledged that the Commission's use of tolling orders to

delay rehearing orders causes "landowners, communities, and the environment" to "suffer needless and avoidable harm" because, "while the parties await their opportunity to challenge the Commission's certificate decision in court," the developer goes ahead and "begin[s] construction on the new pipeline facility[.]" *PennEast Pipeline Co.*, 163 FERC ¶ 61,159, 2018 WL 2453596, at *4 (May 30, 2018) (Glick, Comm'r, concurring).

Of course, the Commission advises the companies that they proceed at the risk that the agency may have a change of heart on rehearing. Commission's Br. 24. Perhaps such words work when the certificate orders just involve monetary payments for fees or rates. But they ring hollow in eminent domain and construction cases like this. Once the property is in the company's possession, the land is cleared, trees are cut down, and the pipeline is cemented into a family's backyard, it is difficult if not impossible to unshuffle the deck. The damage to property rights, property values, and the environment is done. That creates rather than "avoids * * * administrative and judicial problems." *California Co.*, 411 F.2d at 722.

In my view, the better course is to assume that Congress "says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992). So when Congress said that rehearing petitions may be deemed denied and agency action final after 30 days, that is what it meant.

## III

Circuit precedent has already rejected a due-process challenge to the Commission's tolling orders. *See Delaware Riverkeeper*, 895 F.3d at 112–113. Yet, in my view, the

authority our precedent affords the Commission to issue tolling orders while simultaneously allowing eminent domain proceedings and construction to proceed—all before the affected landowner can obtain judicial review of the Commission's public-use determination—skates on thin constitutional ice. And courts must construe statutes to avoid, rather than to create, constitutional problems. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (describing this "cardinal principle" of statutory construction).

**A**

The Due Process Clause of the Fifth Amendment guarantees that "[n]o person shall * * * be deprived of life, liberty, or property, without due process of law[.]" U.S. Const. Amend. V. Due process "calls for such procedural protections as the particular situation demands" to meaningfully protect the constitutional right at stake. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). At a minimum, due process requires an "opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914). And that opportunity "must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). This requirement not only "ensure[s] abstract fair play to the individual." *Fuentes v. Shevin*, 407 U.S. 67, 80–81 (1972). It also "protect[s] his use and possession of property from arbitrary encroachment" by "minimiz[ing] substantively unfair or mistaken deprivations of property[.]" *Id*. at 81. That "danger" is "especially great" when the government "seizes goods simply upon the application of and for the benefit of a private party" such as Transco. *Id*.

Landowners like the Erb and Hoffman families "[u]ndoubtedly * * * have a constitutionally protected property interest in their home." *Freeman v. F.D.I.C.*, 56 F.3d 1394,

1403 (D.C. Cir. 1995). Determining whether the Commission's procedures for allowing private third parties to build on private land pass constitutional muster therefore requires weighing (i) "the private interest that will be affected by the official action"; (ii) "the risk of an erroneous deprivation of such interest through the procedures used"; and (iii) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). That balance weighs against the Commission's current process of saddling landowners with all the harm and risk of delay in its own decisionmaking. And it weighs heavily in favor of reading the statute's 30-day time limit as the plain text prescribes to avoid this constitutional question.

**1**

The right of the Erb and Hoffman families "to maintain control over [their] home[s], and to be free from governmental interference, is a private interest of historic and continuing importance." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53–54 (1993); *id*. at 49 ("The Government does not, and could not, dispute that the seizure of Good's home and 4-acre parcel deprived him of property interests protected by the Due Process Clause.").

And the Commission's decisions authorizing Transco's "physical invasion" of the families' homesteads, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982), constitute a "government intrusion of an unusually serious character," *id*. at 433. Homeowners "suffer[] a special kind of injury when a stranger directly invades and occupies the owner's property." *Id*. at 436 (emphasis omitted); *see also James Daniel Good Real Property*, 510 U.S. at 61 (An

"essential principle" is that "[i]ndividual freedom finds tangible expression in property rights," particularly where the "privacy of the home and those who take shelter within it" is at stake.); *Hendler v. United States*, 952 F.2d 1364, 1374 (Fed. Cir. 1991) ("In the bundle of rights we call property, one of the most valued is the right to sole and exclusive possession—the right to exclude strangers[.]") (emphasis omitted); *cf. United Church of the Med. Ctr. v. Medical Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982) ("It is settled beyond the need for citation * * * that a given piece of property is considered to be unique, and its loss is always an irreparable injury.").

All the more so because building the pipeline would cause "permanent, irreparable environmental harm" to the Erb and Hoffman families' lands. J.A. 581. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987); *see also National Wildlife Fed'n v. Burford*, 835 F.2d 305, 323–325 (D.C. Cir. 1987) ("[D]estroying wildlife habitat, air and water quality, natural beauty, and other environmental and aesthetic values and interests" constitutes irreparable harm.). After all, constructing a gas pipeline is not a tidy intrusion. It requires cutting down the families' trees, digging up their soil, blasting their bedrock, displacing wildlife, and polluting the air.

Once Commission-authorized construction starts, then "meaningful *backward-looking* relief to rectify an[] unconstitutional deprivation" is rarely a viable option. *McKesson Corp. v. Division of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 31 (1990) (emphasis added); *see also Amoco*, 480 U.S. at 545; *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) ("[C]ourts have held that, when interests involving real property are at stake, preliminary

injunctive relief can be particularly appropriate because of the unique nature of the property interest.") (formatting altered) (collecting additional cases).

**2**

The Commission's process leaves landowners like the Erbs and the Hoffmans to bear a material "risk of an erroneous deprivation." *See Mathews*, 424 U.S. at 335. Every time a court reverses, vacates, or remands a Commission pipeline certification decision—or when the Commission grants a landowner's rehearing motion on the merits—it means that the people who had owned and organized their lives on the pipeline-occupied land were subject to an *erroneous* deprivation by the initial decision. *See, e.g.*, *Sierra Club v. FERC*, 867 F.3d 1357, 1379 (D.C. Cir. 2017); *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1320 (D.C. Cir. 2014).

The Commission's prolonged tolling while construction proceeds apace compounds the problem. The Supreme Court has recently recognized that a "property owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation," regardless of whether damages might later ensue. *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162, 2168 (2019) (Takings Clause case involving regulation by state government); *see also id.* at 2170. Prompt access to federal court review of the lawfulness of the taking, including the public use determination, is part of the protection the Fifth Amendment affords. That access is necessary to avoid "hand[ing] authority over federal takings claims to state courts[,]" *id.*, or—as here—to the same federal agency that authorized eminent domain in the first place, *see City of Cincinnati v. Vester*, 281 U.S. 439, 446 (1930) ("[T]he question what is a public use is a judicial one.").

Unsurprisingly, Transco supports the current state of affairs. It reasons that homeowners can always seek mandamus relief under the All Writs Act, 28 U.S.C. § 1651, while the pipeline company's bulldozers keep bulldozing. We agreed in *Delaware Riverkeeper*, 895 F.3d at 113, and I recognize that decision binds this panel.

But the due-process question is whether the Commission's process protects against erroneous deprivations. Mandamus only protects against the most extreme outlier—the clearest, most obvious, and wholly irreparable agency errors, and even then only if a court chooses to use its discretion to grant that extraordinary remedy. *See Cheney v. United States Dist. Court for D.C.*, 542 U.S. 367, 380–381 (2004) (Mandamus requires a showing of "exceptional circumstances," the absence of "other adequate means" to obtain relief, and a "clear and indisputable" right to the writ, and even still "the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.") (formatting altered).

The proof is in the pudding. The Commission routinely fends off mandamus actions while its tolling orders remain in effect. *See, e.g.*, *In re Appalachian Voices*, No. 18-1006 (D.C. Cir. Feb. 2, 2018) (denying property owners' petition for a stay of pipeline construction under the All Writs Act); *In re Appalachian Voices*, No. 18-1271 (4th Cir. March 21, 2018) (same); *Coalition to Reroute Nexus v. FERC*, No. 17-4302 (6th Cir. March 15, 2018) (same). Neither the Commission nor Transco has cited a single instance in which a petitioner opposing pipeline construction has succeeded by invoking the All Writs Act.

The question then becomes "whether 'the risk of an erroneous deprivation' would be reduced" by "procedural

safeguards" that would prevent pipeline construction from beginning until the Commission acts on the merits of rehearing requests. *UDC Chairs Chapter, American Ass'n of Univ. Professors v. Board of Trustees*, 56 F.3d 1469, 1474 (D.C. Cir. 1995) (quoting *Mathews*, 424 U.S. at 335).

The answer is plain as day. Requiring the Commission to act in a timely manner on applications for rehearing would allow landowners to obtain both final agency and federal court review before construction starts. Or the Commission could achieve the same result just by declining to issue construction orders until it resolves certificate rehearing requests on the merits.

**3**

The Commission has no legitimate interest that outweighs the unfairness and risk of harm imposed by the current regime, especially given how easy it would be for the Commission to fix the problem.

The Commission insists that tolling orders are necessary because it takes more than 30 days to resolve the issues raised in applications for rehearing. Oral Arg. Tr. 33. The short answer is that the Commission should raise that argument with Congress, which prescribed the 30-day timeframe for decision. An equally short answer is that the Commission could try working with rehearing applicants to obtain more time by, for example, agreeing to hold its hand on construction orders or staying initial certificate orders to forestall eminent domain proceedings before it takes final action.

If that is too administratively burdensome, then the Commission could try the easiest path of all: take absolutely no action on the rehearing application. That would have the

effect of denying the request as a matter of law. *See* 15 U.S.C. § 717r(a). And that approach would have opened the courthouse doors to the Homeowners four months before the eminent domain decision and five months before construction started. *See id*. § 717r(b).

Lastly, the Commission appeals to the "public need" for the pipeline itself. Oral Arg. Tr. 35. That is pure question-begging. The public need for the Atlantic Sunrise Project—whether the Commission's finding of public convenience and necessity was lawful—is precisely the question for which the Erb and Hoffman families seek judicial review.

Anyhow, it is well-settled that "the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions[.]" *Carey v. Piphus*, 435 U.S. 247, 266 (1978); *see also Fuentes*, 407 U.S. at 87 ("The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing."). In other words, "[t]o one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result[.]" *Coe v. Armour Fertilizer Works*, 237 U.S. 413, 424 (1915). The question is not whether the Erbs and Hoffmans will win; it is only whether they have a right to be fairly and timely heard before their "federal claim dies aborning" in the Commission's process. *Knick*, 139 S. Ct. at 2167.

\* \* \* \* \*

In cases involving private property rights, the Commission has transformed this court's decisions upholding its tolling orders into a bureaucratic purgatory that only Dante could love. While I acknowledge that circuit precedent currently forecloses the Homeowners' constitutional challenge to the tolling orders,

this case starkly illustrates why a second look by us or by the Commission is overdue.