III.
We review the Commission's grant of a Section 7 certificate "under the familiar arbitrary and capricious standard," bearing in mind that "the grant or denial of" such a certificate "is a matter peculiarly within the discretion of the Commission." Minisink , 762 F.3d at 105-06 (brackets and citation omitted). Applying that standard, we sustain the Commission's order against the challenges brought jointly by the Town, Riverkeeper, and the coalition.
A.
In the first set of arguments raised by petitioners, they contend that the Commission failed to comply with NEPA in approving the AIM Project. NEPA generally obligates agencies to take a " 'hard look' at the environmental impacts of a proposed action." Myersville , 783 F.3d at 1324. An environmental impact statement is "deficient, and the agency action it undergirds is arbitrary and capricious, if the EIS does not contain sufficient discussion of the relevant issues and opposing viewpoints, or if it does not demonstrate reasoned decisionmaking." Sierra Club , 867 F.3d at 1368 (internal quotation marks and citations omitted). In evaluating an agency's NEPA analysis, we apply a "rule of reason," and have "refused to 'flyspeck' the agency's findings in search of 'any deficiency no matter how minor.' " Myersville , 783 F.3d at 1322-23 (quoting Nevada v. Dep't of Energy , 457 F.3d 78, 93 (D.C. Cir. 2006) ).
Petitioners present two related arguments under NEPA. First, petitioners contend that the Commission improperly segmented its environmental review by failing to examine the AIM Project and Algonquin's two other pipeline upgrade projects together in a single environmental statement. Second, petitioners submit that the Commission failed to give adequate consideration to the cumulative environmental impacts of the three upgrade projects. We find no basis to set aside the Commission's order on those grounds.
1.
Under the Council on Environmental Quality's regulations implementing NEPA, agencies must consider all "connected actions," "cumulative actions," and "similar actions" within a single environmental impact statement. 40 C.F.R. § 1508.25(a). "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." Del. Riverkeeper Network v. FERC , 753 F.3d 1304, 1313 (D.C. Cir. 2014). The rule ensures that an agency considers the full environmental impact of "connected, cumulative, or similar" actions before they are undertaken, so that it can assess the true costs of an integrated project *252 when it is best situated to evaluate "different courses of action" and mitigate anticipated effects. Id . at 1313-14.
This court has developed a set of factors that help clarify when "physically connected projects can be analyzed separately under NEPA." Id. at 1315. As relevant here, when an agency considers projects non-contemporaneously, see id. at 1318, and when projects have "substantial independent utility," id . at 1316, separate environmental statements can be appropriate.
Applying those considerations in Delaware Riverkeeper , we concluded that the Commission had impermissibly segmented its review of four pipeline upgrades. The projects, we explained, were "connected and interrelated" and "functionally and financially interdependent," and they also had significant "temporal overlap," id. at 1319, because they were "either under construction" or "pending before the Commission for environmental review and approval" at the same time, id. at 1308.
In Minisink and Myersville , by contrast, we sustained the Commission's conduct of separate environmental assessments. In Minisink , we noted that the projects in question lacked the temporal overlap that had characterized the projects in Delaware Riverkeeper . Rather, the application for the later-in-time project had yet to be submitted when the main project was under consideration. Minisink , 762 F.3d at 113 n.11. In Myersville , we reasoned that, unlike Delaware Riverkeeper , the projects were "unrelated" and did not depend on one another for their justification. 783 F.3d at 1326-27.
Because the case before us is more in line with Minisink and Myersville than with Delaware Riverkeeper , we conclude that the Commission did not act arbitrarily and capriciously in declining to consider Algonquin's three projects in a single environmental impact statement. With regard to temporal overlap, the Commission issued the AIM Project certificate in March 2015, Algonquin submitted the application for Atlantic Bridge in October 2015, and Algonquin has yet to file the Access Northeast application. The projects thus were not under simultaneous consideration by the agency.
Nor are the projects "financially and functionally interdependent." Del. Riverkeeper , 753 F.3d at 1319. On that score, we consider "whether one project will serve a significant purpose even if a second related project is not built," Coal. on Sensible Transp., Inc. v. Dole , 826 F.2d 60, 69 (D.C. Cir. 1987), and we look to the "commercial and financial viability of a project when considered in isolation from other actions," Del. Riverkeeper , 753 F.3d at 1316. In denying rehearing, the Commission observed that Algonquin's three projects "held separate open seasons," "executed individual precedent agreements" with largely distinct shippers, and "have different negotiated and recourse rates and separate in-service dates." Rehearing Order ¶ 75. In those circumstances, the Commission reasonably concluded that "the projects do not depend on the other[s] for access to the natural gas market." Id. ¶ 78.
Factual developments after the Commission's completion of environmental review for the AIM Project highlight the permissibility of conducting separate environmental assessments for Algonquin's three projects. Following issuance of the environmental impact statement for the AIM Project, the Atlantic Bridge Project was significantly curtailed: the project's planned capacity decreased by nearly 40 percent, and the length of pipeline to be replaced decreased by 88 percent. Atlantic Bridge Certificate Order ¶ 86 & n.82. If the Commission's environmental impact statement for the AIM Project had taken *253 into account the Atlantic Bridge Project as then conceived, the review would have substantially overstated the environmental impact of the Atlantic Bridge Project. With regard to the Access Northeast Project, meanwhile, Algonquin withdrew the project from the Commission's pre-filing process in June 2017, and it is uncertain when (or whether) the project will go forward. Order Denying Stay, Algonquin Gas Transmission, LLC , 160 FERC ¶ 61,015, at ¶ 6 & n.13 (Aug. 21, 2017).
In short, the functional and temporal distinctness of the three projects, as underscored by factual developments concerning the Atlantic Bridge and Access Northeast Projects, substantiate that it was permissible for the Commission to prepare a separate environmental impact statement for the AIM Project.
2.
Relatedly, the joint petitioners contend that the Commission failed to give sufficient consideration to the cumulative environmental impacts of the AIM, Atlantic Bridge, and Access Northeast Projects. This second species of petitioners' arguments under NEPA fares no better than the first.
An environmental impact statement must assess the "cumulative impacts" of a proposed action. Sierra Club v. FERC , 827 F.3d 36, 49 (D.C. Cir. 2016). A project's "cumulative impact" is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. To satisfy "hard look" review, an agency's cumulative impacts analysis must contain "sufficient discussion of the relevant issues" and be "well-considered." Myersville , 783 F.3d at 1324-25 (citation omitted). But importantly, the adequacy of an environmental impact statement is judged by reference to the information available to the agency at the time of review, such that the agency is expected to consider only those future impacts that are reasonably foreseeable.
At the time of the Commission's consideration of the AIM Project, the impacts of the Atlantic Bridge Project were reasonably foreseeable. And the Commission thoroughly considered the environmental effects of Atlantic Bridge throughout the cumulative impacts section of the AIM Project's environmental impact statement. The statement "contains sufficient discussion of" the cumulative impacts of Atlantic Bridge and is "well-considered." Myersville , 783 F.3d at 1325.
The cumulative impacts discussion of the Access Northeast Project is much more limited, and understandably so. At the time of the AIM Project's environmental impact statement, Access Northeast was months away from entering the pre-filing process and over a year away from issuance of a notice of intent to prepare an environmental impact statement. Given Access Northeast's preliminary stage and the resulting lack of available information about its scope at the time, the project was "too preliminary to meaningfully estimate [its] cumulative impacts." Theodore Roosevelt Conservation P'ship v. Salazar , 616 F.3d 497, 513 (D.C. Cir. 2010) ; see Minisink , 762 F.3d at 113. Additionally, the AIM Project and Access Northeast would "not overlap in time," meaning the short-term impacts from constructing the former would abate before construction commenced on the latter, and no long-term cumulative impacts were reasonably anticipated. Rehearing Order ¶¶ 144-145. In light of "the uncertainty surrounding [Access Northeast], and the difference in timing between the two projects, this discussion suffices under NEPA." Minisink , 762 F.3d at 113.
*254 None of this means that Algonquin will circumvent full consideration of the environmental impact of projects that continue to take shape. To the contrary, later projects can fully account for the cumulative impacts when those effects become better known. And in fact, the environmental assessment for the Atlantic Bridge Project considered the cumulative impacts of the Access Northeast Project once the latter project's details were better defined and its anticipated impacts better understood. Atlantic Bridge Certificate Order ¶¶ 98 n.98, 107-110 (citing Environmental Assessment at 2-129 to 2-130, 2-131 to 2-143). For purposes of the AIM Project, however, the Commission adequately considered the cumulative impacts of the other two projects based on the information then available to the agency.
B.
Petitioners next challenge the Commission's determination that the AIM Project posed no increased threat to the Indian Point nuclear power plant in Westchester County, New York. According to petitioners, the Commission's conclusion is unsupported by substantial evidence. We disagree.
The AIM Project involved installing 2,159 feet of pipeline across the property of the Indian Point facility. The pipeline would be located 1,600 feet from the "power plant structures," and 2,370 feet from Indian Point's "protected security barrier around the main facility sites." Rehearing Order ¶ 197. During the Commission's consideration of the AIM Project, Entergy-the operator of Indian Point-undertook a safety evaluation as required by the relevant regulations. That evaluation determined that the project would pose no additional safety risks to its facility. The Nuclear Regulatory Commission (NRC) conducted an independent analysis and reached the same conclusion. Relying on those expert analyses, the Commission found that the AIM Project "would not pose any new safety hazards" to Indian Point. AIM Project Final Environmental Impact Statement at ES-8 (Jan. 23, 2015).
In evaluating an application for a Section 7 certificate, the Commission must determine that the proposed project is in the "public interest," which requires assessing potential "safety concerns." Washington Gas Light Co. v. FERC , 532 F.3d 928, 932 (D.C. Cir. 2008). If the Commission's safety findings are unsupported by substantial evidence, we vacate the certificate order. Id. at 932-33. Petitioners seek vacatur here, arguing that the Commission erred in adopting the NRC's safety finding concerning the Indian Point facility.
The Commission's factual findings are "conclusive" for our purposes if "supported by substantial evidence." 15 U.S.C. § 717r(b). Substantial evidence "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." Minisink , 762 F.3d at 108 (citation omitted). The Commission's safety finding meets the substantial-evidence threshold.
The Commission of course can rely on expert reports in its decisions. See Murray Energy Corp. v. FERC , 629 F.3d 231, 238 (D.C. Cir. 2011). Here, it relied on two: Entergy's safety evaluation and NRC's confirming analysis. The Commission discussed those evaluations in its environmental impact statement, its certificate order, and its rehearing order, in support of its finding that the "AIM Project can safely operate near Indian Point." Rehearing Order ¶ 201. Those expert opinions qualify as substantial evidence supporting the Commission's safety finding, and the Commission acted well within its discretion in relying on them to grant Algonquin's certificate.
*255 Petitioners contend that the Commission erred in accepting Entergy's and NRC's safety findings rather than those of competing expert analyses that found safety risks to Indian Point from the AIM Project. Specifically, petitioners and their experts fault Entergy and NRC for assuming that gas flow could be terminated within three minutes of a pipeline rupture, and estimating a blast radius based on that assumption. But whereas Entergy's analysis assumed a three-minute response time, NRC directly responded to the opposing experts' concerns about that assumption; after conducting an analysis that assumed a "catastrophic failure" and continuous gas flow for one hour, NRC still concluded that the pipeline posed no safety threat. AIM Project Final Environmental Impact Statement at 4-278. In ratifying NRC's "extensive formal responses" to petitioners' experts, the Commission found NRC's assumptions reasonable and its analysis persuasive. Rehearing Order ¶ 201.
In general, we defer to the Commission's "resolution of factual disputes between expert witnesses," and accept its decision "to credit" one expert's "conclusions" over another expert's if its choice is "reasonable." Murray Energy Corp. , 629 F.3d at 239 (citation omitted). Here, the Commission was faced with Entergy and NRC's analyses, on one hand, and critiques from two independent experts, on the other. It permissibly decided to credit the NRC's expert conclusions, and to accept that NRC's "extensive formal responses" had adequately addressed the opposing experts' concerns. Rehearing Order ¶ 201.
The expert conclusion adopted by the Commission, moreover, was that of another federal agency. Agencies can be expected to "respect [the] views of such other agencies as to those problems" for which those "other agencies are more directly responsible and more competent." City of Pittsburgh v. Fed. Power Comm'n , 237 F.2d 741, 754 (D.C. Cir. 1956). So, for instance, we sustained an agency's decision against undertaking a rulemaking in reliance on the opinion of "other government agencies and non-governmental expert organizations with specific expertise" on the matter. EMR Network v. FCC , 391 F.3d 269, 273 (D.C. Cir. 2004).
In that regard, NRC has particular expertise in assessing external threats to the nuclear facilities it regulates. See, e.g. , New York v. NRC , 824 F.3d 1012, 1019-20 (D.C. Cir. 2016). The Commission determined that it was "satisfied as to [NRC's] competence and the validity of their basic data and analysis," Rehearing Order ¶ 203, and chose to credit NRC's safety conclusions. We see no basis to reject the Commission's decision to do so.
C.
As their final ground for overturning the Commission's grant of a Section 7 certificate, petitioners contend that a third-party contractor that the Commission relied on to prepare the environmental impact statement-Natural Resource Group-had a conflict of interest. Petitioners did not present that objection to the agency. We therefore lack jurisdiction to consider the issue unless we conclude that "there is reasonable ground for [petitioners'] failure" to raise the argument on rehearing before the agency. 15 U.S.C. § 717r(b).
In a case involving an analogous exhaustion provision and a conflict-of-interest claim, we held that a petitioner had demonstrated a "reasonable ground" to excuse the lack of exhaustion because the petitioner "had no reason during the [environmental review] process to suspect the alleged defects in the selection and supervision of [the contractor]."
*256 Communities Against Runway Expansion, Inc. (CARE ) v. FAA , 355 F.3d 678, 686 (D.C. Cir. 2004). Our decision in CARE controls here in light of the similar circumstances. We therefore have jurisdiction to consider the merits of petitioners' conflict-of-interest claim.
We reject petitioners' argument on the merits, however. Petitioners' claim of a conflict of interest rests on an allegation that Natural Resource Group was also hired by a consortium that included Algonquin's parent company to perform public-affairs work in connection with a separate project. That ostensible conflict did not arise until the environmental-review process for the AIM Project was substantially underway. Neither the Commission nor Natural Resource Group failed to follow the conflicts disclosure rules in place at the time. See Fed. Energy Reg. Comm'n, Handbook for Using Third-Party Contractors to Prepare Envtl. Documents for Nat. Gas Facilities & Hydropower Projects at 4-1 to 4-6 (Dec. 2014). In addition, the Commission later once again hired the Natural Resource Group to assist with the environmental statement for the Atlantic Bridge Project. In doing so, the Commission found that the supposed conflict identified by petitioners here was not a "disqualifying conflict" under the Commission's rules. Letter from Chairman Norman Bay to Sen. Elizabeth Warren 2, FERC Docket No. CP16-9 (July 19, 2016). Petitioners offer no basis for disagreeing with that conclusion.
Finally, even if petitioners had identified an actual conflict of interest, it would afford a ground for invalidating the environmental impact statement only if it rose to the level of "compromis[ing] the objectivity and integrity of the NEPA process." CARE , 355 F.3d at 686-87 (formatting modified). That bar has not been met here.
* * * * *
For the foregoing reasons, we dismiss the City of Boston Delegation's petition for review for lack of jurisdiction, and we deny the remaining petitions for review.
So ordered.