# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 25, 2024          Decided May 3, 2024

No. 23-5189

EL PUENTE, ET AL.,
APPELLANTS

v.

UNITED STATES ARMY CORPS OF ENGINEERS, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-02430)

———

*Emily Jeffers* argued the cause for appellants. With her on the briefs were *Catherine Kilduff* and *Marc Fink*.

*Christophe Courchesne* and *Jaclyn Lopez* were on the brief for *amici curiae* Toabajeños en Defensa del Ambiente, et al. in support of appellants.

*Kevin W. McArdle*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Todd Kim*, Assistant Attorney General, *Rachel Heron* and *Christopher C. Hair*, Attorneys, and *Rachel D. Gray*, Senior Civil Works Attorney, U.S. Army Corps of Engineers.

Before: WALKER and PAN, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PAN.

PAN, *Circuit Judge*.  The U.S. Army Corps of Engineers ("the Corps") plans to dredge San Juan Harbor to widen and deepen the channels through which ships travel.  The project will facilitate the movement of large ships — such as cruise ships, cargo ships, and petroleum tankers — that currently cannot navigate the Harbor or cannot do so easily.  The dredging will take approximately a year to complete.  The Corps plans to use barges to transport the dredged material from the Harbor to an offshore dumping site.

The Corps published an Environmental Assessment, which concluded that the dredging project would not have a significant impact on the environment.  And the National Marine Fisheries Service ("the Service") determined that the project was not likely to adversely affect certain threatened and endangered species, including seven types of coral.  Three environmental groups sued the agencies, asserting that they had failed to adequately consider the project's environmental toll.  The district court granted summary judgment in favor of the defendant agencies.  Because the Corps and the Service did not act arbitrarily or capriciously in carrying out their responsibilities to evaluate environmental concerns, we affirm.

**I.**

**A.**

The National Environmental Policy Act ("NEPA") required the Corps to assess the environmental impacts of its plan to dredge San Juan Harbor before authorizing the project.  *See* 42 U.S.C. § 4321 *et seq.*; *Theodore Roosevelt*

*Conservation P'ship v. Salazar*, 616 F.3d 497, 503–04 (D.C. Cir. 2010). To comply with its NEPA obligations, the Corps prepared an Environmental Assessment, which found that the project would not significantly impact the environment and thus allowed the Corps to bypass issuing a more in-depth Environmental Impact Statement. *See Sierra Club v. Peterson*, 717 F.2d 1409, 1412–13 (D.C. Cir. 1983); 40 C.F.R. § 1508.9.[1] The Corps published the draft Environmental Assessment, provided a 45-day period of public review and comment, and held a public meeting about the Environmental Assessment in San Juan. Thereafter, the "Integrated Feasibility Report & Environmental Assessment" was finalized in July 2018, and the Corps issued its formal "finding of no significant impact" in November 2018.

In relevant part, the Corps's Environmental Assessment addressed the following four issues:

(1) *Transition to Liquid Natural Gas ("LNG")*: The Assessment considered the dredging project's facilitation of a potential shift in Puerto Rico's energy market to increased use of LNG. In the early stages of project planning, and well before the publication of the draft Environmental Assessment, the Puerto Rico Electric Power Authority ("PREPA") informed the Corps that it intended to construct an LNG terminal on San Juan Harbor, which would receive and process imported LNG that would be used by two existing power plants that would be converted to natural-gas facilities. Due to the size of the tankers that are used to transport LNG, the construction of an LNG terminal and conversion of the power plants would not be

---

[1]    Except where otherwise noted, we cite the NEPA regulations in effect in 2018 when the Corps published the Environmental Assessment. Those regulations have since been amended. *See* 85 Fed. Reg. 43,304 (July 16, 2020); 87 Fed. Reg. 23,453 (Apr. 20, 2022).

viable unless the Harbor were dredged. Based on PREPA's expressed intentions, the Corps recognized in its Environmental Assessment that "a transition to LNG is a reasonable future assumption." J.A. 191. But it emphasized that "[t]here is a level of uncertainty surrounding PREPA's conversion to LNG and the timing of the conversion" due to many factors, including PREPA's bankruptcy, calls to privatize PREPA, and the impacts of recent hurricanes. *Id.* The Corps thus determined that the project was economically justified whether or not PREPA converted the two power plants to natural-gas facilities. But the Environmental Assessment did not analyze the environmental impacts of LNG development.

(2) *Cumulative Impacts*: The Corps discussed the "cumulative impacts" of the project, as required by NEPA. *See* 40 C.F.R. § 1508.7 (defining "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions"). The Corps looked specifically at two related actions by the U.S. Coast Guard — the expansion of an anchorage area and the relocation of buoys in the Harbor — to determine if the project, when combined with those related actions, would have adverse cumulative impacts on the environment. Ultimately, the Corps explained that "[p]otential cumulative impacts on many resources were considered as part of this study and the majority of these resources were determined to have little risk of being cumulatively impacted." J.A. 228; *see also id.* ("These [resources that were considered] included land use, terrestrial natural resources, threatened or endangered species, other fish and wildlife, managed fishes, the estuarine water column, certain water quality parameters (turbidity and hazardous and toxic constituents), sediments (hazardous and toxic constituents), coastal barrier resources,

harbor shorelines (of properties adjacent to the project), dredged material, air quality, noise, aesthetics, cultural and historic resources, native American resources, environmental justice, and recreation.").

(3) *Environmental Justice*: As required by executive order, the Environmental Assessment included an "environmental justice" analysis that evaluated the project's impact on minority and low-income populations. *See* J.A. 272–75; Executive Order 12,898, § 1-101, 59 Fed. Reg. 7,629 (Feb. 11, 1994) (requiring agencies to "make achieving environmental justice part of [their] mission[s] by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of [their] programs, policies, and activities on minority populations and low-income populations"). In the original analysis, the Corps considered the effects of the dredging project on marginalized communities within a one-mile radius of the *Port* of San Juan (not the entire Harbor). The Corps later updated its environmental-justice analysis in a January 2023 supplemental environmental assessment. The supplemental assessment was prepared in connection with a proposed expansion of the project to dredge an additional area, which the Corps ultimately declined to pursue. The updated analysis encompassed environmental-justice communities in areas within a one-mile and five-mile radius of San Juan *Harbor*.

(4) *Coral*: Fourth and finally, the Environmental Assessment analyzed the potential impact of the project on seven threatened species of coral. In particular, the Assessment examined the extent to which the process of dredging the Harbor and transporting the dredged material to the open ocean would increase turbidity and/or sedimentation — that is, how much it would muddy the water — and thereby harm or kill corals. The Corps determined that none of the threatened coral

species had been documented within either the construction footprint or a 150-meter indirect impact zone, but that there might be some coral near the entrance of the Harbor, along the routes that vessels would take to dispose of dredged material. Accordingly, the Corps determined that it was unlikely that any increase in turbidity and/or sedimentation from the project would significantly affect threatened corals. The Corps also committed to taking steps to ensure that corals would be protected, including (1) conducting additional surveys to determine the precise location of any corals along the disposal routes, (2) using turbidity-monitoring stations near threatened corals along the route, and (3) adopting operational controls to limit the amount of dredged material spilled during transport.

The Endangered Species Act ("ESA") required the Corps to consult with the Service regarding the impact of the dredging project on threatened and endangered species. *See* 16 U.S.C. § 1536(a)(2). When the two agencies first conferred, the Service stated that it could not concur with the Corps's determination that the proposed project was not likely to adversely affect threatened corals. The Service requested more information and then engaged in discussions with the Corps that led to some adjustments of the dredging plans to better protect the corals, including the development of a turbidity-monitoring plan. The Service then changed its position and issued a Biological Opinion, which found in relevant part that the project was not likely to adversely affect the threatened coral species. Like the Corps, the Service noted that video surveys revealed no corals within the dredging areas and that the Corps would monitor turbidity along the disposal route during the project.

**B.**

El Puente de Williamsburg, CORALations, and the Center for Biological Diversity (collectively, "Appellants") filed a lawsuit challenging the dredging project in August 2022, naming as defendants the Corps, the Service, the U.S. Fish and Wildlife Service, and certain administrators. The Complaint included nine claims alleging various violations of NEPA, the ESA, the Clean Water Act, and the Administrative Procedure Act ("APA").

In early 2023, the parties filed cross-motions for summary judgment. The district court issued a detailed opinion ruling in favor of the defendants, concluding that they did not act arbitrarily, capriciously, or contrary to any environmental statute in fulfilling their obligations to examine the environmental impacts of the dredging project.[2] The district court's order resolved only seven of the nine claims alleged in the complaint — Counts 3 and 9 remained outstanding. Accordingly, the district court issued a minute order requiring the parties to file a joint status report on the outstanding counts. In response, the parties filed a joint stipulation of voluntary dismissal of Counts 3 and 9 under Federal Rule of Civil Procedure 41(a)(1)(A)(ii). Appellants then filed the instant appeal.

**II.**

The parties agree that we have jurisdiction to hear this appeal, but we must independently "assure ourselves of our jurisdiction." *In re Brewer*, 863 F.3d 861, 868 (D.C. Cir. 2017). The district court had federal question jurisdiction under 28 U.S.C. § 1331. But we lacked jurisdiction over the

---

[2] On appeal, Appellants challenge only the judgment in favor of the Corps, the Service, and their associated officials.

appeal at the time it was filed because the district court's initial summary judgment order resolved only seven of the nine counts. *See Dukore v. District of Columbia*, 799 F.3d 1137, 1140 (D.C. Cir. 2015) ("[W]hen a district court resolves some, but not all, of the claims in a complaint, the judgment is generally non-final and non-appealable."). The parties' stipulation to voluntarily dismiss the remaining two counts did not create a final appealable order because any dismissal was presumptively without prejudice, *see* Fed. R. Civ. P. 41(a)(1)(B), and "voluntary but non-prejudicial dismissals of remaining claims [are] generally insufficient to render final and appealable a prior order disposing of only part of the case." *Blue v. D.C. Pub. Schs.*, 764 F.3d 11, 17 (D.C. Cir. 2014); *see also Robinson-Reeder v. Am. Council on Educ.*, 571 F.3d 1333, 1339 (D.C. Cir. 2009); *cf. Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1026–27 (D.C. Cir. 2020) (articulating an exception involving certain dismissals of all claims against one party that predate judgment as to the claims against remaining parties).

After we brought the jurisdictional issue to the parties' attention and they filed a joint motion for entry of judgment in the district court, the district court entered summary judgment on Counts 3 and 9, thereby resolving all the claims in the case. As a result, we now have jurisdiction because the district court has entered a final and appealable order. *See* 28 U.S.C. § 1291. We treat the premature notice of appeal as filed on the date that the district court resolved all of Appellants' claims by granting summary judgment on the outstanding counts. *See* Fed. R. App. P. 4(a)(2); *Outlaw v. Airtech Air Conditioning & Heating, Inc.*, 412 F.3d 156, 159 (D.C. Cir. 2005); *Capitol Sprinkler*

*Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 221–23 (D.C. Cir. 2011).

## III.

We review the district court's grant of summary judgment "de novo, as if the agency's decision had been appealed to this court directly." *Gerber v. Norton*, 294 F.3d 173, 178 (D.C. Cir. 2002) (internal quotations omitted).

We will set aside agency action based on a NEPA or ESA violation if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see PEER v. Hopper*, 827 F.3d 1077, 1081 (D.C. Cir. 2016). "[O]ur task is not to flyspeck [the agencies'] environmental analysis for any deficiency no matter how minor," but instead "to ensure that the agency has adequately considered and disclosed the environmental impact of its actions." *Sierra Club v. DOE*, 867 F.3d 189, 196 (D.C. Cir. 2017) (cleaned up). An agency's action is arbitrary and capricious if it has failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (cleaned up). As the parties challenging agency action, Appellants bear the burden to show that the action was arbitrary or capricious. *UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 882 (D.C. Cir. 2021).

## IV.

NEPA "requir[es] federal agencies to take a hard look at their proposed actions' environmental consequences." *Sierra Club v. DOE*, 867 F.3d at 196 (cleaned up). NEPA is "primarily information-forcing"; it "directs agencies only to look hard at the environmental effects of their decisions, and

not to take one type of action or another." *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (cleaned up). In other words, "NEPA is essentially procedural, designed to ensure fully informed and well-considered decisions by federal agencies." *Sierra Club v. DOE*, 867 F.3d at 196 (cleaned up). Rather than "dictate particular decisional outcomes," the statute "merely prohibits uninformed — rather than unwise — agency action." *Id.*

Appellants argue that the Corps and the Service failed to take the necessary "hard look" at the environmental effects of the dredging project. Their challenges largely fall into three categories: (1) segmentation issues, in which Appellants contend that the Corps failed to adequately consider the breadth of the project's impacts and improperly looked at smaller "segments" of the government's actions; (2) environmental-justice issues, in which Appellants argue that the Corps erred in analyzing how the project would affect minority and low-income communities and failed to make the comment process sufficiently accessible; and (3) coral issues, in which Appellants criticize the agencies' scientific analyses regarding the project's impact on certain threatened species of coral.

**A.**

Applicable regulations ensure that an agency cannot "impermissibly segment its NEPA analysis" by "dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Del. Riverkeeper Network*, 753 F.3d at 1314–15 (cleaned up); *see* 40 C.F.R. § 1508.25. Thus, under NEPA regulations, the Corps was "required to include connected actions, cumulative actions, and similar actions in [the] Environmental Assessment." *Myersville Citizens for a Rural Cmty., Inc. v.*

*FERC*, 783 F.3d 1301, 1326 (D.C. Cir. 2015) (internal quotations omitted); 40 C.F.R. § 1508.25(a). Of these three types of actions, Appellants challenge only the Corps's alleged failure to consider a "connected" action — namely, the potential construction of an LNG terminal. "Connected actions" are actions that "are closely related and therefore should be discussed in the same [assessment]." 40 C.F.R. § 1508.25(a)(1).[3]

The Corps also was required to consider the dredging project's direct, indirect, and cumulative impacts. 40 C.F.R. § 1508.25(c). The second two types of impacts are relevant to this appeal. Indirect impacts (or indirect effects) "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b); *see also id.* ("Effects and impacts as used in these regulations are synonymous."). Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7; *see also id.* ("Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."). Our caselaw instructs that:

> [A] meaningful cumulative impact analysis
> must identify (1) the area in which the effects of
> the proposed project will be felt; (2) the impacts

---

[3]    By regulation, "[a]ctions are connected" if they meet one of three criteria: (i) They "[a]utomatically trigger other actions which may require environmental impact statements;" (ii) they "[c]annot or will not proceed unless other actions are taken previously or simultaneously;" or (iii) they "[a]re interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1). Appellants rely on the second of these.

that are expected in that area from the proposed project; (3) other actions — past, present, and proposed, and reasonably foreseeable — that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Del. Riverkeeper Network*, 753 F.3d at 1319.

Appellants contend that the Corps improperly "segment[ed]" its analysis. *See* 40 C.F.R. §§ 1508.25(a), (c); *Del. Riverkeeper Network*, 753 F.3d at 1313. Specifically, Appellants claim that the Environmental Assessment should have considered the potential conversion of existing power plants to LNG facilities as a connected action and an indirect effect. Appellants further assert that the Corps's cumulative-impact analysis should have taken account of the potential for LNG conversion; and that the cumulative-impact analysis also was inadequate for the independent reasons that the Corps failed to define the geographic scope of the impacts and to sufficiently analyze the effect of other projects on the region. Appellants' arguments based on LNG conversion are forfeited because they were not raised before the agency. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004). Although the remaining arguments about cumulative impacts are preserved, they fail because the Corps adequately explained and supported its conclusion that there was little risk that any cumulative impacts would be significant.

1. *Forfeiture of LNG Arguments*

Appellants claim that the Corps should have considered the potential construction of an LNG terminal and its environmental consequences. *See* Reply Br. 3 ("Whether

characterized as a connected action, a reasonably foreseeable project that must be included in the cumulative impacts analysis, or a reasonably foreseeable indirect effect of the dredging project, the Corps was required to consider the environmental consequences of this planned LNG terminal construction and operation in the Assessment."). But we need not reach the merits of any claims based on LNG conversion because they are forfeited.[4]

Agency challengers, like Appellants, generally may not raise NEPA arguments for the first time in litigation; instead, they must "structure their participation [at the administrative stage] so that it alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." *Pub. Citizen*, 541 U.S. at 764 (cleaned up). "[F]ailure to do so 'forfeit[s] any objection' to the environmental analysis on that ground." *Sierra Club v. FERC*, 827 F.3d 36, 51 (D.C. Cir. 2016) (quoting *Pub. Citizen*, 541 U.S. at 764) (alteration in original). Here, Appellants never argued to the Corps that it must consider the environmental impacts of a potential shift to LNG. They therefore have forfeited their LNG arguments and we reject those arguments on that basis.

Appellants argue that the LNG issues are properly before us for two reasons, but neither is convincing. First, Appellants note that an attorney for environmental and community groups, after attending the Corps's public hearing, sent an email to

---

[4]   Although the district court addressed the LNG arguments on the merits and did not discuss forfeiture, the Corps preserved its forfeiture argument in summary-judgment briefing below and raises it again on appeal. *See* ECF No. 22 at 19 (Cross-Motion for Summary Judgment); Gov't Br. 24. We "can affirm a judgment on any basis adequately preserved in the record below." *U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015).

project administrators "[a]ttach[ing] . . . some of the documents [she] mentioned concerning LNG deliveries to Puerto Rico." J.A. 449. But those documents relate to the "Aguirre Offshore Gasport" — an LNG project off the southern coast of Puerto Rico that is seemingly unrelated to the San Juan dredging project, which is located along the northern coast. The cited documents thus did not "alert[] the agency to the parties' position" that the draft Environmental Assessment should have evaluated environmental impacts of LNG conversion near the Harbor. *Pub. Citizen*, 541 U.S. at 764 (cleaned up).

Second, Appellants argue that the Environmental Assessment's "flaws [were] so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *Pub. Citizen*, 541 U.S. at 765. We are unpersuaded. As an initial matter, the exception for "obviousness" is narrow. It appears that neither we nor the Supreme Court has ever used the "so obvious" language from *Public Citizen* to revive a forfeited argument. To the contrary, on the rare occasions when we previously cited that language, we concluded that it did not justify forgiving forfeiture under the circumstances. *See New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 482 (D.C. Cir. 2012) (concluding that failure to consider non-health environmental effects of nuclear waste storage and disposal, such as decrease in property values and harm to a Native-American community's homeland, was not so obvious as to obviate the need to raise the issue before the agency); *see also Pub. Citizen*, 541 U.S. at 765 (concluding the agency's failure to evaluate un-raised alternatives to the proposed rulemaking was not an obvious flaw).

In any event, the asserted need to analyze the environmental impacts of LNG conversion was far from "obvious" in this case. Although potential LNG conversion

was discussed as the dredging project was planned, those general discussions did not make it "obvious" that the *environmental impacts* of LNG conversion should be considered as a "connected action," "cumulative impact," or "indirect effect" of the project. In fact, the potential construction of an LNG terminal did not appear to warrant detailed consideration due to the uncertainty that the construction would occur: At the time that the Corps prepared the Environmental Assessment, PREPA had not initiated any federal-permit application or requested any federal action related to potential LNG conversion; and PREPA itself faced potential privatization, bankruptcy, and the debilitating effects of two hurricanes. *See El Puente v. Army Corps of Eng'rs*, -- F. Supp. 3d --, 2023 WL 4706152, *10–11 (D.D.C. July 24, 2023) (district court rejecting LNG arguments on the merits). Moreover, the Corps convincingly argues that it was not required to consider the potential impact of LNG conversion, at least as a "connected action," because the Corps has no regulatory authority over the construction or operation of LNG terminals. *See* 15 U.S.C. § 717b(e)(1) (conferring authority over the construction of LNG terminals to the Federal Energy Regulatory Commission); *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1185 (D.C. Cir. 2023) (declining to adopt a reading of "connected actions" that "would require the [agency] to consider the indirect effects of actions beyond its delegated authority"). Thus, the Environmental Assessment's failure to consider the environmental effects of potential LNG conversions was not an "obvious" flaw. *Pub. Citizen*, 541 U.S. at 765. We therefore conclude that Appellants forfeited their LNG arguments, and we decline to consider them.

2. *Cumulative Impacts Analysis*

NEPA required the Corps to consider not just the impacts of the project itself, but the "cumulative impacts" of the project

when combined with other actions affecting the environment. Regulations define a "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. Our precedent provides further guidance, requiring a cumulative-impact analysis to "identify," among other things, "the area in which the effects of the proposed project will be felt," and "other actions — past, present, and proposed, and reasonably foreseeable — " that have impacted or will impact that area. *Del. Riverkeeper Network*, 753 F.3d at 1319. Appellants contend that the Corps's cumulative-impact analysis failed to take account of those necessary considerations. We disagree.

Appellants first argue that the Corps did not identify "the area in which the effects of the proposed project will be felt" in the cumulative-impacts section of the Environmental Assessment, as mandated by *Delaware Riverkeeper Network*, 753 F.3d at 1319. Although the Corps did not specify an affected region in its cumulative-impact analysis, it broadly defined the Environmental Assessment's "study area" as San Juan Harbor and various federal channels and terminals surrounding the Harbor. *See* J.A. 94, 96; *see also id.* at 74 ("The San Juan Harbor, Puerto Rico study area encompasses the bar (entrance) channel, inner harbor channels, offshore dredged material placement sites, beneficial use dredged material placement sites, and any extension of the water bodies and shorelines that could be impacted by proposed improvements."). Although we have recognized that an agency may identify a broader region for its cumulative-impacts analysis, *Sierra Club v. FERC*, 38 F.4th 220, 233–34 (D.C. Cir. 2022), we have not previously *required* a cumulative-impact analysis to expressly designate a region of impact that is

different from the Environmental Assessment's "study area." Appellants suggest that cumulative impacts may extend to a broader area than direct or indirect effects, but they do not develop an argument that the Assessment's "study area" was arbitrary and capricious (either in general or as applied to the cumulative-impacts analysis). Given our deferential standard of review, we can discern the path taken by the agency and find it sufficient: The Corps identified a "study area" for the overall Assessment, and we can infer that the study area also was the affected region assessed in the cumulative-impact analysis. *See Jost v. Surface Transp. Bd.*, 194 F.3d 79, 85 (D.C. Cir. 1999) ("We will . . . uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Sierra Club v. FERC*, 38 F.4th at 234 ("Making this selection [of the location to examine in the cumulative-impacts analysis] demands a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies." (cleaned up)).

Appellants next argue that the Corps failed to identify enough "past, present, . . . and reasonably foreseeable" other actions, and thus could not analyze the cumulative impacts of the dredging project when combined with such actions. *See Delaware Riverkeeper*, 753 F.3d at 1319. But as Appellants admit, the Corps did identify two other actions — the proposed expansion of an anchorage area and the relocation of certain buoys — and determined that "the net contribution to cumulative adverse impacts due to the proposed project and the overall cumulative adverse impact will be appropriately minimized." J.A. 228. The Corps also extensively detailed the existing conditions in the Harbor elsewhere in the Assessment, and then — in the cumulative-impacts section — summarized its conclusion: "Potential cumulative impacts on many resources were considered as part of this study and the majority

of these resources were determined to have little risk of being cumulatively impacted." *Id.* Under the circumstances, the Corps's analysis in the Environmental Assessment was sufficient.

**B.**

A long-standing executive order "require[s] federal agencies to include environmental-justice analysis in their NEPA reviews." *Sierra Club v. FERC*, 867 F.3d at 1368; *see* Executive Order 12,898, § 1-101, 59 Fed. Reg. 7,629 (Feb. 11, 1994). The environmental-justice analysis forces agencies "to consider whether the projects they sanction will have a 'disproportionately high and adverse' impact on low-income and predominantly minority communities." *Sierra Club v. FERC*, 867 F.3d at 1368; *see also* Executive Order 12,898, § 3-302(a) (requiring agencies to collect and analyze demographic data "to determine whether their . . . activities have disproportionately high and adverse human health or environmental effects on minority populations and low-income populations"). As for the geographic scope of the environmental-justice analysis — that is, what low-income and minority communities to consider — "an agency's delineation of the area potentially affected by the project must be reasonable and adequately explained, . . . and include a rational connection between the facts found and the decision made." *Vecinos para el Bienestar de la Comunidad v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021) (cleaned up). "[A] petitioner may challenge an agency's environmental justice analysis as arbitrary and capricious under NEPA and the APA." *Id.*

Appellants take issue with three elements of the Corps's environmental-justice analysis: (1) its geographic scope, (2) the availability of public participation, and (3) the purportedly

inadequate disclosure of the project's impacts on water and air quality. We take each in turn.

1. *Geographic Scope*

In conducting its initial environmental-justice analysis as part of the 2018 Environmental Assessment, the Corps limited the scope of its review to a one-mile radius around the Port of San Juan. But in 2023, as part of a supplemental environmental assessment undertaken when the Corps considered expanding the project, the Corps prepared a supplemental environmental-justice analysis that defined the "project area" as the entire San Juan Harbor and analyzed effects to environmental-justice communities in both a one-mile and five-mile "buffer zone" around the Harbor. J.A. 1155–57.

Appellants argue that the geographic scope of the initial environmental-justice analysis in the Environmental Assessment was too narrow, but they do not dispute the adequacy of the expanded geographic scope in the supplemental analysis. Thus, the issue before us is whether we can consider the 2022 supplemental analysis, as the district court did and as the Corps asks us to do. Appellants contend that the later analysis is an impermissible post-hoc rationalization. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020). They note that a reviewing court "must judge the propriety of agency action solely by the grounds invoked by the agency" at the time of the action. *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 624 (2023) (cleaned up).

To start, the agency performed the supplemental analysis as part of its evaluation of a good-faith proposal to expand the project's dredging footprint. *See* 40 C.F.R § 1502.9(d)(1) (2022). Indeed, such a supplemental analysis must be published as part of a formal administrative record, *see id.*

§ 1502.9(d)(3) (2022), which we are required to consider when evaluating the agency's action, *Calcutt*, 598 U.S. at 628. Because the Corps did not commission the supplemental analysis just to address a perceived shortcoming in its prior work, the facts here do not fit the pattern of a typical post-hoc rationalization. *See, e.g.*, *Regents of Univ. of Cal.*, 140 S. Ct. at 1908 (rejecting post-hoc rationalization where agency head offered "additional explanation for [a prior] decision" and thus only "elaborate[d] on the reasons for the initial [action] rather than tak[ing] new administrative action"); *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 11 n.11 (D.C. Cir. 2006) (concluding that reasons for agency action raised for first time in appellate brief are "post hoc rationalizations . . . , and we are barred from considering them" (cleaned up)); *Ass'n of Civilian Technicians v. Fed. Lab. Rels. Auth.*, 269 F.3d 1112, 1117 (D.C. Cir. 2001) ("Post-hoc rationalizations, developed for litigation[,] are insufficient.").

Moreover, it would make little sense for us to remand for the Corps to broaden the scope of the environmental-justice analysis contained in the initial Environmental Assessment because the agency has *already* conducted the broader analysis in the supplemental assessment. *See Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 91 (D.C. Cir. 1986) ("[W]e cannot order the appellee departments to do something they have already done."). We have declined to order injunctive relief under analogous circumstances, where an agency failed to timely file an environmental impact statement with Congress, as required by NEPA, but later prepared and filed an adequate statement. *Realty Income Tr. v. Eckerd*, 564 F.2d 447, 457 (D.C. Cir. 1977).[5] We therefore conclude that we may properly

---

[5] Appellants rely heavily on a Ninth Circuit case that distinguished *Realty Income Trust* and vacated and remanded an

rely on the 2022 environmental-justice supplemental analysis in determining that the relief Appellants seek with respect to the original analysis would be "inappropriate," regardless of any initial error. *Id.*

Appellants argue that, even if we can consider it, the supplemental analysis does not defeat their challenge because it addressed only the impacts of proposed additional dredging, not the dredging that had already been approved in 2018. But that argument misunderstands the record. Although the supplemental environmental *assessment* generally "evaluate[d] only the dredging of a new area," J.A. 1090; *see also id.* at 1128, that is not the case for the supplemental environmental-justice analysis. The Corps announced in its supplemental environmental assessment that it had decided not to pursue the expanded dredging, and the related supplemental environmental-justice analysis assessed the impact of the project only as authorized (that is, without the additional dredging). It concluded that the project, not the proposed expansion, "will not have disproportionately high or adverse impacts on low income or minority communities." *Id.* at 1155–56; *see also id.* at 1127 ("[I]n response to comments, the [Corps] updated the [environmental-justice] footprint to cover a one- and five-mile radius around the full harbor deepening area . . . . Based on this updated [environmental-justice] analysis, the [Corps] has still determined that the project will not result in disproportionately high or adverse impacts on low income or minority communities.").

In sum, even if we assume that the geographic scope of the 2018 environmental-justice analysis was arbitrary or

agency decision even though the agency prepared a post-hoc environmental assessment. *See Metcalf v. Daley*, 214 F.3d 1135, 1145–46 (9th Cir. 2000). To the extent these cases conflict, we are bound by our court's precedent.

capricious, the 2022 supplemental analysis cured that flaw and rendered any additional relief unnecessary and improper.

### 2. *Language / Comment Period*

Appellants next argue that "[t]he Corps failed to effectively disclose all expected impacts to local communities," Appellants Br. 28, because (1) it did not translate all materials into Spanish, and (2) it did not extend the comment period for the Environmental Assessment when Hurricanes Irma and Maria struck Puerto Rico.

The Corps's decision not to translate the draft Environmental Assessment and all related materials into Spanish was not arbitrary and capricious. The most relevant portion of the Executive Order on environmental justice makes this a discretionary call: "Each Federal agency *may*, whenever practicable and appropriate, translate crucial public documents, notices, and hearings relating to human health or the environment for limited English speaking populations." Executive Order 12,898, § 5–5(b) (emphasis added); *see United States v. McIlwain*, 931 F.3d 1176, 1180 (D.C. Cir. 2019) ("The word 'may' clearly connotes discretion." (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103 (2016)). Instead of translating the materials, the Corps took other steps: It sent letters in Spanish about the draft environmental assessment to interested parties; it orally provided an overview of the draft in Spanish at the public meeting; and it offered to make the Spanish version of the public-meeting presentation available to the public afterwards. The Corps's decision not to do more — such as to translate the lengthy draft Environmental Assessment in its entirety — was not arbitrary or capricious.

As for the comment period, although one commenter asked whether it would be extended, the Corps did not receive any formal requests for an extension of time to comment, and

no one attempted to submit late comments. Under those circumstances, the Corps's decision not to extend the deadline or to solicit late comments on its own accord was not arbitrary or capricious.

### 3. *Oil Spills / Pollution*

Finally, Appellants briefly argue that the Corps did not "effectively . . . disclose the environmental impacts of a proposed project," *Nat. Res. Def. Council, Inc. v. Nuclear Regul. Comm'n*, 685 F.2d 459, 487 n.149 (D.C. Cir. 1982), because "the Corps failed to disclose all the expected adverse impacts in these [environmental-justice] areas, including the potential concentration of pollutants and the risk of bigger oil spills from larger tankers." Appellants Br. 29. But the environmental-justice analysis did address the cited concerns: It stated that "[n]o long term adverse direct or indirect impacts from noise *or air emissions* are expected as a result of the . . . Project," and that "[t]he Project will *increase* the security, safety, and efficiency of the San Juan Harbor." J.A. 1156 (emphases added). Elsewhere in the record, the Corps also noted that the project will "reduc[e] the potential for ship groundings and subsequent oil spills." *Id.* at 903. The Corps thus adequately considered pollutants and oil spills and disclosed their related impacts.

### C.

Lastly, we turn to the agencies' analysis of the project's impact on seven threatened species of coral. Appellants' coral-related claims arise under NEPA and the ESA. NEPA required the Corps to "[b]riefly provide sufficient evidence and analysis for . . . [its] finding of no significant impact" in its Environmental Assessment. 40 C.F.R. § 1508.9(a)(1). Relatedly, the ESA directed the Corps to consult with the Service to determine whether the planned dredging and related

activities would adversely affect any endangered or threatened species. An "informal consultation" is permissible if the agency conducting a project (here, the Corps) determines that the project "is not likely to adversely affect listed species," and the Service concurs in that determination. 50 C.F.R. §§ 402.13(c); 402.14(b)(1). But if the action "may affect an endangered species," the ESA requires a more in-depth "formal consultation" between the agencies. *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 178 (D.C. Cir. 2017) (citing 50 C.F.R. § 402.14(a)–(b)) (internal quotations omitted). In carrying out the consultation process, the agencies must use the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

Applying those statutory frameworks, the Corps made a "finding of no significant impact" on the environment under NEPA, *see* 40 C.F.R. § 1508.9, and the Service concurred in a related finding that the project "is not likely to adversely affect" any threatened species of coral under the ESA, 50 C.F.R. § 402.13(a). Both the Corps and Service based their conclusions on scientific literature; surveys showing that no protected coral were present within 150 meters of the dredging footprint; and plans to (1) conduct further surveys to determine if and where coral was located along the disposal route, (2) place turbidity-monitoring stations near any such coral, and (3) use best practices to minimize any spilling of dredged material during transport.

Appellants contend that the Corps's NEPA analysis and the Service's ESA determination were arbitrary and capricious because the agencies failed to consider the best available science derived from a recent dredging project in Miami, and the agencies improperly relied on uncertain mitigation measures. In addition, Appellants argue that the Corps did not gather adequate baseline data on the presence of coral, and that

the Service changed its position on the project's likely impact on threatened corals without justification. We address each argument in turn.

1. *Best Available Science*

Appellants claim that the Corps and the Service did not use the "best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), in assessing the project's detrimental effect on corals. Specifically, Appellants assert that the agencies failed to consider evidence from a recent dredging project in the Port of Miami, which revealed negative impacts to corals that were far away from the dredging site. But contrary to Appellants' contentions, the Corps noted its consideration of the Miami project at the time of the initial Environmental Assessment. *See* J.A. 396 ("Based on conditions out there we will implement lessons learned from Miami and follow up on what the sensors indicate."); *id.* at 913 ("The recently completed project at Miami Harbor resulted in temporary effects to corals associated with dredging, however those corals were located immediately adjacent to the channel (within 30 meters), unlike [San Juan Harbor] where dredging activities will not be directly adjacent to the hardbottom areas that are located no less than 182 meters (600 feet) to the west of the channel."). Moreover, additional evidence from the Miami project came to light after the Assessment was prepared. The agencies' further analysis based on that evidence noted that the two projects "are very different," and concluded that it was "extremely unlikely" that the instant project would negatively affect corals in the way that the Miami project did. *Id.* at 1168.[6] Even if the agencies

---

[6] We do not intend to suggest that a post-hoc rationalization could make up for an inadequate initial explanation. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1909. We seek only to highlight that, because the Miami project was completed just a few years prior to

could have explained in more detail the "lessons learned from Miami" at the outset, *id.* at 396, perfection is not required, and the agencies adequately considered the available science and data.

## 2. *Uncertain Mitigation Measures*

Next, Appellants attack the agencies' reliance on a monitoring plan and a promise to take action if turbidity levels unexpectedly exceed projections. The monitoring plan included in the Corps's Environmental Assessment stated: "In order to reduce the chances of turbidity and sedimentation impacts to ESA-listed corals . . . from dredging and potential leaks from disposal vessels, the [Corps] will work in conjunction with the [Service] to develop a turbidity monitoring plan." J.A. 217. Though not every detail of the plan was included in the Environmental Assessment, the Corps provided the contours:

> The plan will include turbidity monitoring stations adjacent to ESA-listed corals (if any are found during the pre-construction resource surveys) and at the edges of the [habitat] for elkhorn and staghorn corals near the disposal vessel transit route. The exact number and locations of the monitoring stations will be determined and detailed in the collaborative

---

the Corps's Environmental Assessment, not all scientific studies as to the previous project's impacts on corals had been completed when the Corps began its environmental analysis. As the Corps learned more, however, it properly responded. *Cf.* 40 C.F.R. § 1502.9(d)(1)(ii) (requiring supplemental environmental analysis if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts").

monitoring plan. Turbidity in these locations must not exceed 7 Nephelometric Turbidity Units (NTUs) above background as measured at the control locations positioned 200 meters (m) upstream of the dredge. The monitoring plan will include adaptive management measures to be implemented to mitigate turbidity in the event that turbidity exceeds 7 NTUs above background at these locations. Adaptive management may include measures to correct disposal vessel leakage, reducing overflow, etc.

*Id.*; *see also id.* at 1186–87 (description of monitoring plan by the Service).

Appellants challenge the turbidity-monitoring plan by citing out-of-circuit cases that have rejected reliance on undefined and unenforceable mitigation measures. *See, e.g.*, *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733–36 (9th Cir. 2001). But even if we assume, *arguendo*, that the rule announced in those non-binding cases is correct, the monitoring plan here is not undefined. It includes details, such as the use of turbidity-monitoring stations, a specific threshold at which adaptive management measures will be implemented,[7] and the potential targets of those measures, depending on the cause of any increased turbidity. Further, the Service indicated that it would reinitiate consultation if the monitoring plan is not in place or if turbidity persists above the established threshold.

---

[7] Appellants take issue with the agencies' selection of seven turbidity units above background as the threshold. But, as highlighted by the Service in explaining its determination, that triggering threshold "is more conservative than the current EPA standard of 29 NTUs over background or the Puerto Rico standard of 10 NTU[s] over background for project related turbidity." J.A. 1187.

That level of specificity distinguishes the instant mitigation measures from the ones discussed in the cases cited by Appellants.

### 3. *Baseline Data*

Appellants next argue the Corps failed to conduct sufficient baseline surveys before the project was approved to determine whether corals were present in the mouth of the Harbor, instead relying on a plan to conduct post-approval surveys. Appellants likely forfeited this argument by not raising it in their summary-judgment briefing below, but the Corps has not argued that the issue is forfeited. *See* ECF No. 20-1 at 24–29 (Motion for Summary Judgment); *Flynn v. Comm'r*, 269 F.3d 1064, 1068–69 (D.C. Cir. 2001); *BNSF Ry. Co. v. Surface Transp. Bd.*, 604 F.3d 602, 611 (D.C. Cir. 2010) ("[A] forfeiture can be forfeited by failing on appeal to argue an argument was forfeited."). In any event, the argument fails on its merits. The Corps looked at video surveys of the dredging areas, which confirmed that no corals were present within the footprint, as well as existing studies of habitats. And the Corps explained the measures it would take to limit leakage during the transportation of dredged materials if corals were present along the transport route. The Corps *additionally* planned to conduct post-approval surveys of other areas along the vessel disposal routes to confirm the precise locations of coral and to place turbidity-monitoring stations next to them. That approach adequately considered the presence of corals.

### 4. *Service's Change in Position*

Finally, Appellants note that the Service initially did not concur with the Corps's conclusion that corals were not likely to be adversely affected by the dredging project and instead requested further information. Appellants criticize the Service for failing to explain its "flip-flop in position" when the Service

subsequently agreed with the Corps's assessment. Appellants Br. 43 (citing *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 537 (2009)).

We disagree that there was a "policy change" for the Service to acknowledge or explain: The Service's preliminary correspondence about the corals did not embody the sort of authoritative agency policy or position that triggers the rule prohibiting agencies from "ignor[ing] or countermand[ing] [their] earlier factual findings without reasoned explanation for doing so." *FCC v. Fox*, 556 U.S. at 537. Moreover, the Corps responded to the Service's initial letter by providing additional information, meeting with the Service to discuss the relevant issues, and modifying its plan to monitor turbidity. The record thus reflects that steps were taken to address the Service's concerns, and that its final decision to concur with the Corps therefore was not arbitrary or capricious.

\*   \*   \*

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*